**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VERIFONE, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | Civil Action No. 16-105-SLR |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| POYNT CO., | ) | |
| | ) | |
| Defendant. | ) | |

**DEFENDANT POYNT CO.'S OPPOSITION TO PLAINTIFF VERIFONE, INC.'S**
<u>**MOTION FOR PRELIMINARY INJUNCTION**</u>

OF COUNSEL:

Joseph C. Gratz
Clement S. Roberts
Michael A. Feldman
DURIE TANGRI LLP
217 Leidesdorff Street
San Francisco, CA 94111
(415) 362-6666

Philip A. Rovner (#3215)
Jonathan A. Choa (#5319)
POTTER ANDERSON & CORROON LLP
1313 North Market Street, 6th Floor
Wilmington, DE 19801
(302) 658-9200
provner@potteranderson.com
jchoa@potteranderson.com

*Attorneys for Defendant Poynt Co.*

Dated:  June 20, 2016
Public Version:  June 27, 2016

## TABLE OF CONTENTS

**Page**

I.     INTRODUCTION ...............................................................................................1

II.    ARGUMENT ....................................................................................................2

    A.    A Preliminary Injunction Is an "Extraordinary" Remedy........................................2

    B.    Verifone Cannot Establish a Likelihood of Success on its Trademark
        Claim...................................................................................................2

        1.    Because merchants do not regard the term "point" as an indicator
            of source, Verifone lacks trademark rights in that term.............................2

        2.    Verifone cannot meet its burden to show a likelihood of confusion. ..........6

            a.    The degree of similarity between the marks ...................................6

            b.    The strength of the owner's mark .................................................7

            c.    The care and attention one expects would be given when
               making a purchase........................................................................7

            d.    The length of time the alleged infringer has used the mark
               without evidence of actual confusion arising and the
               evidence of actual confusion..........................................................8

            e.    The intent of the alleged infringer in adopting the mark ..............11

            f.    Whether the goods are marketed through the same
               channels, the extent to which the target markets are the
               same, and the perceived relationship of the goods ......................12

            g.    Other facts suggesting that the prior owner might be
               expected to expand into the alleged infringer's market ................13

    C.    Verifone Has Not Clearly Established that it will Suffer Irreparable Harm
        in the Absence of an Injunction. ............................................................13

        1.    Verifone's delay undermines any claim of irreparable harm....................14

        2.    Verifone's allegations of harm are speculative........................................16

        3.    Any harm can be addressed without an injunction ...................................17

    D.    The Balance of Harm and Equities Favors Poynt.................................................17

## <u>TABLE OF AUTHORITIES</u>

**Page**

### <u>Cases</u>

*A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*,
  237 F.3d 198, 227 (3d Cir. 2000) .......................................................................................... 11

*Acierno v. New Castle Cty.*,
  40 F.3d 645 (3d Cir. 1994) .................................................................................................... 17

*Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*,
  793 F.3d 313 (3d Cir. 2015) .................................................................................................... 2

*Ashland Oil, Inc. v. Olymco, Inc.*,
  No. 94-5520, 1995 WL 499466 (6th Cir. Aug. 21, 1995) ...................................................... 5

*Beech-Nut, Inc. v. Warner-Lambert Co.*,
  480 F.2d 801 (2d Cir. 1973) ................................................................................................... 6

*Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*,
  973 F.2d 1033 (2d Cir. 1992) ................................................................................................. 6

*Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*,
  921 F.2d 467 (3d Cir. 1990) ................................................................................................... 5

*Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,
  269 F.3d 270 (3d Cir. 2001) ................................................................................................. 11

*Citizens Banking Corp. v. Citizens Financial Group, Inc.*,
  No. 07-11514, 2008 WL 1995104 (E.D. Mich. May 6, 2008), *aff'd*, 320 F.
  App'x 341 (6th Cir. 2009) ................................................................................................... 4, 5

*Eagle Snacks, Inc. v. Nabisco Brands, Inc.*,
  625 F. Supp. 571 (D.N.J. 1985) ............................................................................................. 5

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*,
  765 F.3d 205 (3d Cir. 2014) ................................................................................................. 13

*Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*,
  626 F.2d 193 (1st Cir. 1980) ................................................................................................. 9

*Freedom Card, Inc. v. JPMorgan Chase & Co.*,
  432 F.3d 463 (3d Cir. 2005) ................................................................................................... 7

*Interpace Corporation v. Lapp, Inc.*,
  721 F.2d 460 (3d Cir. 1983) ................................................................................................... 6

## TABLE OF AUTHORITIES (CONT'D)

Page

*Inwood Labs., Inc. v. Ives Labs., Inc.*,
  456 U.S. 844 (1982) .................................................................................. 3

*Keebler Co. v. Rovira Biscuit Corp.*,
  624 F.2d 366 (1st Cir. 1980) ..................................................................... 3

*Kos Pharm., Inc. v. Andrx Corp.*,
  369 F.3d 700 (3d Cir. 2004) ............................................................... 2, 18

*Le Cordon Bleu v. BPC Publ'g Ltd.*,
  327 F. Supp. 267 (S.D.N.Y. 1971) .......................................................... 14

*N.B.A. Credit Union, Inc. v. Hargrove*,
  834 F. Supp. 845 (E.D. Pa. 1993) ........................................................... 16

*New Dana Perfumes Corp. v. The Disney Store, Inc.*,
  131 F. Supp. 2d 616 (M.D. Pa. 2001) ................................................ 14, 16

*NutraSweet Co. v. Vit–Mar Enters., Inc.*,
  176 F.3d 151 (3d Cir. 1999) ...................................................................... 2

*PaperCutter, Inc. v. Fay's Drug Co., Inc.*,
  900 F.2d 558 (2d Cir. 1990) ...................................................................... 3

*Pappan Enters. v. Hardee's Food Sys., Inc.*,
  143 F.3d 800 (3d Cir. 1998) .................................................................... 13

*Pharmacia Corp. v. Alcon Labs., Inc.*,
  201 F. Supp. 2d 335 (D.N.J. 2002) ........................................................... 5

*Primepoint, L.L.C. v. Primepay, Inc.*,
  No. CIV. 06-1551 (RMB), 2009 WL 1884369 (D.N.J. June 30, 2009), *aff'd*,
  401 F. App'x 663 (3d Cir. 2010) ............................................................. 11

*Quest Integrity USA LLC v. Clean Harbors Indus. Servs., Inc.*,
  Civ. No. 14-1482 (SLR), Dkt. No. 99 (D. Del. June 12, 2015) ............... 13

*QVC, Inc. v. Your Vitamins, Inc.*,
  714 F. Supp. 2d 291 (D. Del. 2010) ........................................................ 18

*Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
  Civ. No. 07-190 (SLR), 2008 WL 114361 (D. Del. Jan. 9, 2008) ........... 17

*Symbol Techs., Inc. v. Janam Techs. LLC*,
  729 F. Supp. 2d 646 (D. Del. 2010) ........................................................ 20

# TABLE OF AUTHORITIES (CONT'D)

**Page**

*Taj Mahal Enterprises, Ltd. v. Trump*,
   745 F. Supp. 240 (D.N.J. 1990) ........................................................................................... 10

*Taussig v. Wellington Fund, Inc.*,
   187 F. Supp. 179, 200 (D. Del. 1960), *aff'd*, 313 F.2d 472 (3d Cir. 1963) ............................ 8

*Ultimate Trading Corp. v. Daus*,
   No. CIV. A. 07-4203 (JLL), 2007 WL 3025681 (D.N.J. Oct. 15, 2007) .............................. 14

*Waddington N. Am. Bus. Trust v. EMI Plastics, Inc.*,
   No. 02-CV-3781(FB), 2002 WL 2031372 (E.D.N.Y. Sept. 5, 2002)...................................... 8

*Wellman, Inc. v. Eastman Chem. Co.*, Civ.
   No. 07-585-SLR, 2008 WL 4449608 (D. Del. Oct. 3, 2008) ................................................ 17

*Winter v. Nat. Res. Defense Council, Inc.*,
   555 U.S. 7 (2008).................................................................................................................. 13

*Zippo Manufacturing Co. v. Rogers Imports, Inc.*,
   216 F. Supp. 670 (S.D.N.Y. 1963) ......................................................................................... 4

## Other Authorities

4 McCarthy on Trademarks and Unfair Competition
   § 23:20.50 (4th ed. 2016).......................................................................................................... 6

## I.    INTRODUCTION

Verifone's motion is an attempt by a multi-billion-dollar company to misuse an emergency procedure to take out an upstart competitor.  The Court should deny that attempt.

First, Verifone cannot show that it is likely to succeed on the merits.  Prior to filing this lawsuit, ███████████████████████████████████████████████████████ ██████████████████████████████████████ Verifone ███████████████████ ██████████████████████████████, has purged the "point" branding from its website, and ██████████████████████████. ██████████████████████████████████ it doesn't function as a trademark—that is, as a designation of the source or origin of goods.  Instead, as shown by Poynt's expert's survey, the vast majority of relevant consumers do not consider "point" a brand name at all, and the few who do consider it a brand do not associate it with Verifone.  As a result, Verifone has no trademark rights in the word, and the defendant's use of "Poynt" is not likely to cause confusion.

Second, Verifone cannot show a likelihood of irreparable harm.  The evidence shows that Verifone's executive team knew about Poynt and its product for nearly two years prior to filing its motion.  Verifone attempts to excuse its delay by asserting that the parties were in close settlement discussions until February of this year, but that is not true, which is why there is no contemporaneous evidence of any such discussions.  And given ██████████████████████ ███████████████████████████████████████████████████████████ ███████████████, shows there is no chance that waiting until trial to see if an injunction is warranted will irreparably damage Verifone.

Third, the balance of equities weighs heavily against granting the motion.  As noted above, Verifone is attempting to use a brand ████████████████████████████ to invoke emergency procedures against a would-be competitor it has known about for a long time.  The

timing is not an accident.  The payment card industry requires a series of expensive and time-consuming certifications that would need to be redone if Poynt were forced to change its name.  By waiting to bring this motion until just prior to Poynt's product launch, Verifone hopes to delay that launch, ███████████████████████████████████████████████████ ███████████████████████████.  The Court should not permit this to happen and should instead deny Verifone's request for the "extraordinary" relief afforded by a preliminary injunction.

## II.   ARGUMENT

### A.   A Preliminary Injunction Is an "Extraordinary" Remedy

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances."  *Arrowpoint Capital Corp. v. Arrowpoint Asset Mgmt., LLC*, 793 F.3d 313, 318 (3d Cir. 2015) (internal quotation omitted).  "A party seeking a preliminary injunction must show: (1) a likelihood of success on the merits; (2) that it will suffer irreparable harm if the injunction is denied; (3) that granting preliminary relief will not result in even greater harm to the nonmoving party; and (4) that the public interest favors such relief."  *Kos Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004).  The "failure to establish any element renders a preliminary injunction inappropriate."  *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999).

### B.   Verifone Cannot Establish a Likelihood of Success on its Trademark Claim

#### 1.   Because merchants do not regard the term "point" as an indicator of source, Verifone lacks trademark rights in that term.

The threshold question in a trademark-infringement claim is whether the plaintiff has any trademark rights—that is, whether the putative trademark is either inherently distinctive or whether it has acquired distinctiveness (also called "secondary meaning").  A putative trademark is distinctive when, "in the minds of the public, the primary significance of a product feature or

term is to identify the source of the product rather than the product itself." *Inwood Labs., Inc. v. Ives Labs., Inc.*, 456 U.S. 844, 851 n.11 (1982).

Verifone relies entirely on its trademark registrations to establish its trademark rights, and offers no other argument or evidence to show distinctiveness. While trademark registrations give rise to a presumption that trademark rights exist, that presumption is rebuttable with evidence that the putative trademark does not identify the source of a product in the minds of the public. *See PaperCutter, Inc. v. Fay's Drug Co., Inc.*, 900 F.2d 558 (2d Cir. 1990) (the presumption of distinctiveness is overcome with affirmative evidence that the mark is not distinctive); *Keebler Co. v. Rovira Biscuit Corp.*, 624 F.2d 366, 373 (1st Cir. 1980) (only a preponderance of the evidence in the record is required to overcome the presumption).

To obtain evidence on that issue, Poynt commissioned expert Hal Poret to conduct a survey among a group of 250 small business merchants in the U.S. who accept in-person credit card payments in their businesses and who are the primary decisionmaker about which credit card processing machine or service to use. *See* Declaration of Hal Poret ("Poret Decl.") Ex. A. The survey was designed to determine the extent to which relevant consumers regard the term "point" as an identifier of source in the context of credit card processing machines or services.

The survey results overwhelmingly support Poynt. First, 83.2% of respondents do not associate "point" with *any* company or companies that provide credit card processing machines or services. *Id.* at 28. Second, 95% of respondents do not associate the term "point" with any *one* company that provides those machines or services. *Id.* Third, more than 99.5% of respondents do not associate the term "point" with Verifone. *Id.* at 28. Indeed, while only *one* out of 250 respondents associates the term "point" with Verifone, *nine* associate the name with the unrelated payment company Square. *Id.* Moreover, seven respondents who initially

answered that they associated the term "point" with one or more providers of credit card

processing machines or services, when asked which company or companies they meant,

explicitly stated that they associated the term "point" only with the generic term "point of sale."

*Id.* at 25-28.

The survey shows that "point" does not identify a particular source of point-of-sale

hardware or services in the minds of relevant consumers.  Consequently, "point" does not have

the distinctiveness necessary for Verifone to succeed in its claim to have trademark rights in the

term.  Indeed, far greater levels of recognition have resulted in findings of no trademark rights.

For example, in *Zippo Manufacturing Co. v. Rogers Imports, Inc.*, 216 F. Supp. 670, 689

(S.D.N.Y. 1963), the court was asked to determine whether consumers associated a particular

design of lighter with the plaintiff, such that the defendant's admitted copying of that shape

might be actionable.  Fully 25% of the consumers surveyed associated the plaintiff's design with

the plaintiff.  *Id.*  Nonetheless, the court held that the plaintiff had not established distinctiveness,

because an equal number of respondents affirmatively associated the design with other sources.

*Id.* at 689-90*,* 701.

Similarly, *Citizens Banking Corp. v. Citizens Financial Group, Inc.*, No. 07-11514, 2008

WL 1995104, at *5 (E.D. Mich. May 6, 2008), *aff'd*, 320 F. App'x 341 (6th Cir. 2009) involved

a survey with a similar design to the one Mr. Poret performed in this case.  In *Citizens*, the

percentage of respondents associating the putative trademark with any single source was 52% (as

compared with 5% here).  *Compare id. with* Poret Decl. Ex. A at 28.  The percentage of

respondents who identified the plaintiff as that source was 8% (as compared with 0.4% here).

*Compare Citizens Banking Corp.* , 2008 WL 1995104, at *5 *with* Poret Decl. Ex. A at 28.  The

court in *Citizens* denied the plaintiff's request for an injunction on the ground that the survey

results showed the putative trademark to lack distinctiveness. *Citizens Banking Corp*, 2008 WL 1995104, at *6. Numerous other cases have reached similar conclusions. *See, e.g.*, *Ashland Oil, Inc. v. Olymco, Inc.*, No. 94-5520, 1995 WL 499466, at *4 (6th Cir. Aug. 21, 1995) (8% identification of the plaintiff as source of putative trademark reflected a lack of distinctiveness).

Verifone has not come forward with any survey evidence of its own. Because a consumer survey is "the most direct method of demonstrating secondary meaning," the Third Circuit has held that "a plaintiff's failure to conduct such a survey where it has the financial resources to do so, could lead a jury to infer that the plaintiff believes the results of the survey will be unfavorable." *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 475-76 (3d Cir. 1990). That inference applies equally at the preliminary-injunction stage. *See, e.g.*, *Pharmacia Corp. v. Alcon Labs., Inc.*, 201 F. Supp. 2d 335, 373 (D.N.J. 2002) (applying that inference and denying preliminary injunction); *Eagle Snacks, Inc. v. Nabisco Brands, Inc.*, 625 F. Supp. 571, 583 (D.N.J. 1985) (same).

The results of Poynt's survey should not be surprising given the ████████ ████████████████████████████████████████████████████████████████ ███████████████████████ and the fact that Verifone itself purged the brand from its website prior to filing suit. *Compare* Declaration of Michael A. Feldman ("Feldman Decl.") Ex. A (Wakefield Depo. Ex. 12) *with id.* Ex. B (Wakefield Depo Ex. 13); *see also* Feldman Decl. Ex. C (Wakefield Depo. Tr.) at 139:6-15; 170:3-8. Indeed, of the millions of merchants who accept credit cards in the United States, ███ ██ have signed up for *any* version of the Verifone Point service. *See* Feldman Decl. Ex. C (Wakefield Depo. Tr.) at 288:10-20; 291:10-14. Thus, the preponderance of the record evidence shows that Verifone does not have trademark rights in the mark "point." No further inquiry should be necessary to deny the "extraordinary" remedy

Verifone requests.

## 2. Verifone cannot meet its burden to show a likelihood of confusion.

Even if the Court were to conclude that Verifone has trademark rights in the term "point," Verifone's motion should be denied because it cannot show a likelihood of confusion. "The long and short of the law is that trademark infringement hinges on the likelihood of confusion of an appreciable number of reasonable purchasers." 4 McCarthy on Trademarks and Unfair Competition § 23:20.50 (4th ed. 2016). The factors that courts in this circuit consider in making that determination are set forth in *Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983). Those factors do not demonstrate that confusion is likely.

### a. The degree of similarity between the marks

The word "point" is a shortened version of the phrase "point of sale." The mark POYNT makes use of this fact, by its difference in spelling from the generic term, to indicate that the Poynt Smart Terminal is an innovative point-of-sale device. To be sure, POYNT is pronounced the same as the first word in "point of sale," and the second word in VERIFONE POINT. But similarities in a generic term are not cognizable for trademark purposes. These facts are like those in *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033, 1041 (2d Cir. 1992), which dealt with the term "Excedrin PM." The court held that while "Excedrin PM" as a whole was a trademark because it was associated with a particular source of goods, "PM" standing alone was not. The court based its decision on its finding that the plaintiff "had not presented sufficient evidence that consumers recognized the source of 'Excedrin PM' by the 'PM' designator and that there was no evidence that Bristol had ever marketed the product as 'PM.'" *Bristol-Myers,* 973 F.2d at 1041; *see also, e.g.*, *Beech-Nut, Inc. v. Warner-Lambert Co.*, 480 F.2d 801, 803 (2d Cir. 1973) (affirming denial of preliminary injunction because the only similarity between BREATH SAVERS and BREATH PLEASERS was a descriptive word).

### b.      The strength of the owner's mark

Poynt's survey evidence shows that "point" does not function as an indicator of source in the context of retail credit-card payment machines or services.  To the extent it did, it would be an exceedingly weak mark, because more than 99.5% of the relevant consumers do not associate it with Verifone, and many *more* relevant consumers associate the mark with other payment companies than associate it with Verifone.  *See* Section II(B)(1).

### c.      The care and attention one expects would be given when making a purchase

Both parties' customers exercise a high degree of care and attention to their purchasing decisions because credit-card payments are the lifeblood of many small businesses.  

*See* Feldman Decl. Ex. C (Wakefield Depo Tr.) at 303:18-304:10; 304:21-305:3.

*Id.* 306:22-23.  Indeed, getting up and running with Verifone's service

. *Id.* at 164:22-166:1.  The goods are not inexpensive: Verifone's service costs                                                      , while the Poynt Smart Terminal costs $499

. *Id.* at 305:4-19; Wakefield Decl. ¶ 26; Declaration of Osama Bedier ("Bedier Decl.") ¶¶ 3-4.  Thus, the relevant consumers exercise a high degree of care.

As a point of comparison, the Third Circuit affirmed a district-court finding that ordinary citizens exercise a high enough degree of care when choosing their own credit cards so as to weigh against a likelihood of confusion.  *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.3d 463, 477 (3d Cir. 2005).  *A fortiori*, merchants—whose livelihood depends on credit card

payments—exercise a degree of care that is at least as high.

In the face of the survey evidence demonstrating that small merchants do not regard the term "point" as an indicator of source, Verifone may argue that the real problem is a likelihood of confusion among the merchant acquirers to whom Poynt sells its terminals at wholesale.  That theory fares no better.  Merchant acquirers are the paradigmatic "sophisticated consumers": ▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

Accordingly, this factor strongly suggests that Verifone will not succeed in convincing a jury that there is a likelihood of confusion.  *See, e.g.*, *Waddington N. Am. Bus. Trust v. EMI Plastics, Inc.*, No. 02-CV-3781(FB), 2002 WL 2031372, at *9 (E.D.N.Y. Sept. 5, 2002) (denying preliminary injunction where distributors to whom the parties sold were highly sophisticated and there was no evidence of substantial confusion among less-sophisticated downstream buyers).

> **d.      The length of time the alleged infringer has used the mark without evidence of actual confusion arising and the evidence of actual confusion**

Poynt has been using the name POYNT publicly since October, 2014.  There is no evidence that any consumer has been confused.  Indeed, there is no evidence of any significant amount of confusion *at all*—among consumers of the relevant product or anyone else.  It is Verifone's burden to come forward with evidence of actual confusion.  *Taussig v. Wellington Fund, Inc.*, 187 F. Supp. 179, 200 (D. Del. 1960), *aff'd*, 313 F.2d 472 (3d Cir. 1963) ("Plaintiffs' failure to produce evidence of confusion strongly corroborates the conclusion that there has been

none.").  Verifone's purported evidence falls into three categories, none of which should be persuasive.

*First*, Verifone points to (unsupported) testimony that in some instances Verifone employees needed to clarify, in conversation, whether they were talking about Poynt or about Verifone Point.  Verifone, Inc.'s Amended Opening Brief in Support of its Motion for Preliminary Injunction, ECF No. 37 ("Pl.'s Mot.") at 13.  There is no indication that anyone was actually confused as to source—only that, because "Point" and "Poynt" are pronounced the same, the speaker had to clarify to which one he or she was referring.  That clarification does not reflect confusion of the type that is cognizable under trademark law.  Indeed, requests for clarification regarding which of two sources of goods is being referred to, "[f]ar from revealing such confusion . . . indicate that these customers, at least, had the difference in source clearly in mind."  *Fisher Stoves, Inc. v. All Nighter Stove Works, Inc.*, 626 F.2d 193, 195 (1st Cir. 1980).

*Second*, Verifone asserts that "Verifone employees in sales and marketing have repeatedly been asked whether Poynt is related to Verifone[.]"  Pl.'s Mot. at 13.  Verifone's support for this assertion is weak.  Mr. Surber and Mr. Wakefield's declarations state, in virtually identical language, that they have been asked whether there is a relationship between the Poynt Smart Terminal and Verifone's Point service—but provide no information about who, when, or where these alleged conversations took place.  *See generally* Wakefield Decl.; Suber Decl.  And in his deposition, Mr. Wakefield testified that he was referring to "more than two" conversations among the more than 300 people he talked to at each of five trade shows, and to the double-hearsay that two Verifone employees had reported to the marketing team, when asked for instances of confusion, that "a couple" (unspecified) external contacts were confused in some (unspecified) manner by the name.  Feldman Decl. Ex. C (Wakefield Depo. Tr.) at 348:13-

361:15.  For his part, Mr. D'Agostino testified at his deposition that he was referring solely to clarifying which business he was referring, and that none of the people he spoke to appeared to believe the companies or their products were affiliated.  Feldman Decl. Ex. D (D'Agostino Depo. Tr.) at 48:14-59:3.  That is the sum total of the evidence Verifone was able to muster.  It consists of nothing but hearsay and non-specific memories, involves only a tiny number (out of thousands) of customer contacts, and contains no indication that Verifone suffered any harm.  Even if the evidence were credited, a showing that "some people have inquired about the relationship between plaintiff and defendants," where the plaintiff "fails to show that any potential customers of plaintiff's [business] were actually diverted to defendants' [business] due to their confusion," constitutes "merely a scintilla of evidence on the issue of a likelihood of confusion" and does not weigh in favor of a finding of likelihood of confusion.  *Taj Mahal Enters., Ltd. v. Trump*, 745 F. Supp. 240, 250-51 (D.N.J. 1990) (granting defendant's motion for summary judgment).

*Third*, Verifone points to a single email from Helen Baptist, of a company called Fishbowl, ████████████████████████████████████████████████████████.  Pl.'s Mot. at 13.  Ms. Baptist's email asks Mr. Surber about opportunities to monetize data collected in connection with the Verifone Point service.  *See* Suber Decl. Ex. A.  But Ms. Baptist misspells it "Poynt" instead of "Point."  *Id.*  That misspelling is not an indication that Ms. Baptist believes that there is any affiliation between the two companies; the email is at least equally consistent with Ms. Baptist having made a typographical error.  ████████████████████ ████████████████████████████████████████████████████████.  *See* Bedier Decl. ¶ 5.  Even if Verifone had come forward with evidence that Ms. Baptist actually was confused, it would not indicate that Verifone is likely to succeed in showing a likelihood of

confusion at the end of the case, because "isolated and idiosyncratic" instances of actual confusion do not support a finding of likelihood of confusion. *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 227 (3d Cir. 2000). "In particular, if isolated instances of confusion arise in the context of a large volume of contacts, these instances should be accorded relatively little weight." *Primepoint, L.L.C. v. Primepay, Inc.*, No. CIV. 06-1551 (RMB), 2009 WL 1884369, at *11 (D.N.J. June 30, 2009), *aff'd*, 401 F. App'x 663 (3d Cir. 2010). For that reason, a few reported instances of confusion among hundreds or thousands of trade-show conversations, with no corroborating evidence and no evidence of any diversion of business, does not reflect a problem requiring the extraordinary remedy of a preliminary injunction.

> e.     The intent of the alleged infringer in adopting the mark

Poynt's intent in adopting the POYNT mark was to communicate that the product was a new and different kind of point-of-sale hardware, not to suggest an association with Verifone.

If there was "evidence of intentional, willful and admitted adoption of a mark closely similar to the existing marks," that would weigh strongly in favor of a finding of likelihood of confusion. *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*, 269 F.3d 270, 286 (3d Cir. 2001) (internal quotation omitted). The question is whether the defendant's adoption of its mark was "intentionally done for the purpose of profiting from the notoriety of" the plaintiff's mark. *A & H Sportswear, Inc.*, 237 F.3d at 226. Where the defendant had a good-faith understanding, based on a review of USPTO records, that there were no similar marks in use in related areas of business, this factor does not weigh in favor of a finding of likelihood of confusion. *Id.*

Poynt's founder, Mr. Bedier, selected its name in the fall of 2013. Bedier Decl. ¶ 7. At that time, Mr. Bedier was aware of a point-of-sale payments company in Europe called Point

which had been acquired in 2011 by Verifone, but understood that company to be operating only in Europe.  *Id.* ¶ 8.  Mr. Bedier also believed that the business model pursued by Point in Europe precluded expansion into the United States, because that expansion would require Verifone to compete directly with its own best customers—the major United States merchant acquirers.  *Id.* ¶ 9.  Before settling on the name Poynt, Mr. Bedier searched the USPTO trademark database to see whether either Point or Verifone had sought to register the POINT mark for use in the United States.  *Id.* ¶ 10.  Mr. Bedier understood and expected that, if it intended to use that mark in the United States, a company as large and sophisticated as Verifone would seek registration with the PTO.  *Id.* ¶ 11.  He found no Verifone filings relating to POINT.  *Id.* ¶ 10.  Indeed, Verifone did not file with the PTO until December 31, 2014—*after* Poynt filed for its own trademark registration on October 15, 2014.  *See* Feldman Decl. Ex. E.

Because there is no evidence that Poynt selected its name intending to trade on any goodwill in the Point name—and because there is affirmative evidence to the contrary—this factor weighs against a finding of likelihood of confusion.

> **f.** **Whether the goods are marketed through the same channels, the extent to which the target markets are the same, and the perceived relationship of the goods**

While the Verifone's service offering and the Poynt Smart Terminal both relate to point-of-sale payments, they are not marketed through the same channels.

Poynt ███████████████████████████████████ does not provide any payment services.  Bedier Decl. ¶ 3.  In contrast, Verifone Point is a payment service that ████ ██████████████████████████████████.  Feldman Decl. Ex. C (Wakefield Depo. Tr.) at 165:9-166:1; 292:19-293:15.  Thus, the products are primarily offered in different sales channels.

The offerings also serve different parts of the payments ecosystem, and do not directly

compete with one another.  Instead, the Poynt Smart Terminal competes with Verifone's hardware products—devices to which Verifone gives very different names such as VX 690, VX 680, e355, MX 925, and MX 860.  *See* Feldman Decl. Ex. F (Verifone Website).  Put differently, Verifone's service offering is competitive with the merchant acquirers ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮  Thus, while both products are point-of-sale solutions, they are not sold in the same channels and do not directly compete with each other.  This factor is therefore neutral.

> **g.      Other facts suggesting that the prior owner might be expected to expand into the alleged infringer's market**

There are no indications that Verifone intends to expand the scope of the VERIFONE POINT brand.  To the contrary, as discussed below, every indication is that Verifone intends to cease using that brand name.  *See* Section II(C)(2).

Accordingly, Verifone has failed to show a likelihood of confusion.  This failure demonstrates both that Verifone is not likely to succeed on the merits of its trademark infringement claim and that an injunction would not serve the public interest in the avoidance of consumer confusion as to the source of goods or services.  *Pappan Enters. v. Hardee's Food Sys., Inc.*, 143 F.3d 800, 807 (3d Cir. 1998).

> **C.      Verifone Has Not Clearly Established that it will Suffer Irreparable Harm in the Absence of an Injunction.**

Verifone also cannot carry its burden to "clearly establish" that it will suffer irreparable harm.  *See Quest Integrity USA LLC v. Clean Harbors Indus. Servs., Inc.*, Civ. No. 14-1482 (SLR), Dkt. No. 99 at 16 (D. Del. June 12, 2015); *see also Winter v. Nat. Res. Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  Courts in this circuit do not presume irreparable harm; Verifone must offer proof.  *See Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 217 (3d Cir. 2014).  But Verifone has offered none.  To the contrary, Verifone's actions show an affirmative *absence* of irreparable harm.

### 1.    Verifone's delay undermines any claim of irreparable harm

Verifone did not move for a preliminary injunction until March 21, 2016.  *See* ECF No.

7.  At that point, Verifone's executives had known about Poynt for more than two years:

> ➢ In January 2014, Vincent D'Agostino—who had reviewed a term sheet describing Poynt, its name, and its business—joined Verifone as an officer and was put in charge of Verifone Point.  *See* Feldman Decl. Ex. D (D'Agostino Depo. Tr.) at 84:24-85:4, 74:4-75:21; 77:2-78:20.

> ➢ In October 2014, Verifone's executives attended the keynote of the Money 20/20 conference during which Poynt presented on its name, product and mission.  *See id.* at 87:2-13.  Verifone asserts work-product protection for activities dating back to the time of that keynote.  Feldman Decl. Ex. C (Wakefield Depo. Tr.) 27:17-23.  Because work product only applies where there is specific anticipation of litigation, Verifone anticipated litigation against Poynt at least as early as October 2014.

> ➢ On September 22, 2015 Verifone initiated legal action against Poynt by opposing Poynt's trademark application with the USPTO.  *See* Feldman Decl. Ex. G.

This delay alone should be fatal to Verifone's efforts to show irreparable harm.  Even the September 22, 2015 date shows a delay of *six months* prior to moving for a preliminary injunction.  Courts have consistently found that delays as short as two months are fatal to a plaintiff's efforts to show that it is facing the kind of imminent risk of irreparable harm for which the extraordinary remedy of a preliminary injunction is appropriate.  *See e.g.*, *New Dana Perfumes Corp. v. The Disney Store, Inc.*, 131 F. Supp. 2d 616, 630 (M.D. Pa. 2001) ("'[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months.'") (internal citations omitted); *Ultimate Trading Corp. v. Daus*, No. CIV. A. 07-4203 (JLL), 2007 WL 3025681, at *3 (D.N.J. Oct. 15, 2007) (denying preliminary injunction for delay of three months to sue and two more months to move for a preliminary injunction); *Le Cordon Bleu v. BPC Publ'g Ltd.*, 327 F. Supp. 267, 270-71 (S.D.N.Y. 1971) (plaintiff cannot show irreparable harm because it waited more than 13 weeks "after the defendants' initial announcement and eight weeks after the appearance of the first issue" during which time plaintiff

14

allowed "defendants [to] expend[] . . . initial production costs in excess of $1,125,000").

Verifone argues that its delay should be excused because it was supposedly negotiating with Poynt to change Poynt's name between October 2014 (when Verifone attended the Money 20/20 conference) and February of 2016 (when it filed this suit).  Pl.'s Mot. at 19.  Not so.

First, the parties were not negotiating settlement during this period.  The first time Verifone reached out to Poynt with any discussion of brand names was in January, 2015.  Bedier Decl. ¶ 12.  Over the next year, Mr. D'Agostino admits that he never made any mention of trademark law with Mr. Bedier and does not recall ever raising a trademark or brand name issue with Mr. Bedier in any subsequent meeting until February 2016.  *See* Feldman Decl. Ex. D (D'Agostino Depo. Tr.) at 140:15-25; 135:1-10; *see also* Bedier Decl. ¶¶ 13-14.  Thus, at most, Mr. D'Agostino claims he had an initial conversation in January 2015 and then let the issue drop until just before this suit was filed.  And Mr. Bedier's memory is even more emphatic; he recalls no suggestion that Poynt change its name after January 2015, and denies that the parties were ever engaged in settlement discussions as to that issue.  *Id*.  This difference in testimony is especially striking given the *complete* absence of evidence supporting Mr. D'Agostino's assertion that there were regular meetings and negotiations on this issue.  *See* Feldman Decl. Ex. D (D'Agostino Depo Tr.) at 133:14-134:14.  If the companies were engaged in such a protracted negotiation, wouldn't there be *at least one* email about potential deal terms?  One calendar entry about meeting to discuss the issue?  But there is nothing.

Second, Verifone clearly thought it needed to take legal action when its current litigation counsel brought an action in the USPTO to block Poynt's trademark application on September 22, 2015.  Thus, more than six months before filing this motion, Verifone was sufficiently concerned about Poynt that it had hired litigation counsel and initiated a proceeding to block

Poynt's trademark registration.  At a minimum, Verifone undisputedly delayed at least six months in bringing this motion—a time period that is far too long to support the proposition that emergency relief is necessary to prevent irreparable harm.  *See New Dana Perfumes Corp.*, 131 F. Supp. 2d at 630.

### 2.    Verifone's allegations of harm are speculative

The only harm Verifone alleges is speculative and, if it does occur, will take place at some uncertain point in the future.  Speculative harm, however, is not enough, because "a showing of irreparable harm is insufficient if the harm will occur only in the indefinite future; the moving party must make a clear showing of immediate irreparable harm."  *N.B.A. Credit Union, Inc. v. Hargrove*, 834 F. Supp. 845, 851-52 (E.D. Pa. 1993).



As noted previously, Verifone has removed "Verifone Point" from its website, and ▮▮▮▮ ▮▮▮▮▮▮▮▮.  *Compare* Feldman Decl. Ex. A *with id.* Ex. B; *see also* Feldman Decl. Ex. C (Wakefield Depo. Tr.) at 139:6-15, 170:3-8.  Verifone's corporate witness, Jeffrey Wakefield, sent an email ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Feldman Decl. Ex. H.  Mr. Wakefield also testified that ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ Feldman Decl. Ex. C (Wakefield Depo Tr.) at 224:6-21 (emphasis added).  ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* at 369:7-20.  But no matter:  at a minimum it is speculation for Verifone to assert that Poynt (rather than ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮) is the source of any harm the "point" brand may suffer between now and trial.

Second, Verifone argues that Poynt *might* suffer from poor quality or *might* have a

security breach and that Verifone *might* be considered responsible for such a breach. *See* Pl.'s Mot. at 16-19. This argument is pure speculation: there is no evidence that Poynt will experience a security breach, much less "immediately." And there is contrary evidence: Poynt's product has been given the highest certification for security offered by the industry's trade organization (PCI). Bedier Decl. ¶ 2. Similarly, there is no evidence that Poynt makes a poor quality device and ample evidence that it does not. *Id*. ¶ 1.

### 3. Any harm can be addressed without an injunction

Verifone's purported fear of loss of trade, goodwill, and reputational control does not require an injunction to remedy. *See* Pl.'s Mot. at 16-19. First, the loss of trade is economic harm that can be addressed with money damages. *See Acierno v. New Castle Cty.*, 40 F.3d 645, 653 (3d Cir. 1994) ("Economic loss does not constitute irreparable harm."). Indeed, given the small size of Verifone's service offering the monetary damages required to address any harm will be small. *See Wellman, Inc. v. Eastman Chem. Co.*, Civ. No. 07-585-SLR, 2008 WL 4449608, at *3 (D. Del. Oct. 3, 2008) (the plaintiff "has failed to clearly establish that monetary damages could not suffice" where the product line at issue "account for only a small percentage of [plaintiff's] total business"). Even a loss of market share, standing alone, cannot establish irreparable harm. *Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc*., Civ. No. 07-190 (SLR), 2008 WL 114361, at *6 (D. Del. Jan. 9, 2008). Nor is an injunction necessary to prevent reputational harm or harm to goodwill. As discussed above, Verifone has been able to successfully manage the tiny number of people who supposedly needed clarification about which brand was being referred to in conversation. *See* Section II(B)(2)(d).

### D. The Balance of Harm and Equities Favors Poynt

Verifone bears the burden of proving "that granting preliminary relief will not result in even greater harm to [Poynt]" than the harm to Verifone that the injunction would prevent. *Kos*

*Pharm., Inc.*, 369 F.3d at 708; *see QVC, Inc. v. Your Vitamins, Inc.*, 714 F. Supp. 2d 291, 297 (D. Del. 2010) ("Traditional rules of equity apply to requests for injunctive relief.").  In this case, the equities weigh against entering a preliminary injunction for four reasons.

 ***First***, as discussed previously, Verifone ███████████████████████████████ █████████████████████ took concrete steps in that direction including removing the "Point" brand from its website and ███████████████████████.  *See* Section II(C)(2).  Verifone made no mention of these facts in its opening brief and has instead (incorrectly) asserted that it had only "***internally*** proposed a rebranding strategy."  Pl.'s Mot. at 18.

 ***Second***, the timing of Verifone's current motion has been calculated to inflict maximum damage on a small competitor.  For Poynt to sell its products, it must obtain industry certifications.  Bedier Decl. ¶ 22.  Those certifications



*Id.*; Declaration of Ray Tanaka ("Tanaka Decl.") ¶ 5. Tanaka Decl. ¶¶ 4-5. .  *Id.* ¶ 4.

 Against this background, Verifone acted inequitably in waiting until just prior to Poynt's product launch to seek a preliminary injunction.  Had Verifone moved reasonably promptly, an injunction would not have been nearly as catastrophic because Poynt could have had new parts manufactured and *recertified* its products under a new name without impacting its product

launch date.  *Id.* ¶ 8.

 *Third*, as discussed above in Section III(B)(2)(e), Poynt's founder's intent in selecting its name does not tilt the equities against Poynt, because the name was selected in good faith following a search of PTO records.

 *Fourth,* the harm that granting an injunction would do to Poynt far outweighs any benefit to Verifone. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

 On the other hand, the harm to Verifone from *denying* a preliminary injunction would be insignificant.  According to its public filings, Verifone had more than $1.3 *billion* in revenue in 2015.  Feldman Decl. Ex. I at 61.  In contrast, Verifone claims only to have earned "████ ██████" through its service offering during the three and a half year period dating back to 2013.  Pl.'s Mot. at 1.  Thus, even if the Court assumes ███████████████████████ ███████████████████████████████████████████████ ████████████████████████ the harm to Verifone would only be on the order of $1

million.  Out of more than $1.3 billion.

This result is precisely the kind of disproportionate impact that should weigh heavily against entry of a preliminary injunction.  *See Symbol Techs., Inc. v. Janam Techs. LLC*, 729 F. Supp. 2d 646, 665 (D. Del. 2010) ("[Plaintiff] will not be forced out of business if [Defendant] is not enjoined . . . . In contrast, [Defendant]'s CEO testified that as a small business, [Defendant] will be destroyed if a preliminary injunction is entered.  In light of these considerations, the Court concludes that the balance of hardships weighs in favor of [Defendant], and against the granting of a preliminary injunction.").[1]

Accordingly, because Verifone has not met its burdens to show that a preliminary injunction is necessary, Verifone's motion should be denied.


                                                    POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Joseph C. Gratz                          By:   */s/ Philip A. Rovner*
Clement S. Roberts                              Philip A. Rovner (#3215)
Michael A. Feldman                              Jonathan A. Choa (#5319)
DURIE TANGRI LLP                                Hercules Plaza
217 Leidesdorff Street                          P.O. Box 951
San Francisco, CA 94111                         Wilmington, DE 19899
(415) 362-6666                                  (302) 984-6000
                                                provner@potteranderson.com
                                                jchoa@potteranderson.com

Dated:  June 20, 2016                    *Attorneys for Defendant Poynt Co.*
Public Version:  June 27, 2016

---

[1] To the extent the Court is inclined to grant a preliminary injunction, it should allow Poynt adequate time to change the name of the product and go through the recertification process before the injunction takes effect.  Although such an injunction would still harm Poynt severely, it *might* prevent the injunction from becoming a mortal wound.