IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

VERIFONE, INC.,                    )
                                   )
          Plaintiff,               )
                                   )
     v.                            )        Civ. No. 16-105-SLR
                                   )
POYNT CO.,                         )
                                   )
          Defendant.               )

**MEMORANDUM**

At Wilmington this \Ħ day of August, 2016, having reviewed the papers filed in connection with plaintiff's motion for a preliminary injunction, and having heard oral argument on the same, the court issues its decision to deny the motion, for the following reasons:

1. **Procedural background.** On February 24, 2016, plaintiff VeriFone Inc. ("plaintiff") filed a complaint alleging, inter alia, trademark infringement against defendant Poynt Co. ("defendant"). (D.I. 1) The court has jurisdiction over the Lanham Act claims pursuant to 28 U.S.C. §§ 1331 and 1338(a) and (b). The court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

2. Plaintiff is a corporation formed under the laws of the State of Delaware with a principal place of business in San Jose, California. (D.I. 1 at ¶ 13) Defendant is a corporation formed under the laws of the State of Delaware with a principal place of business in Palo Alto, California. (*Id.* at ¶ 14)

3. **Factual background.**[1]  Plaintiff is a large corporation founded 35 years ago that provides retail payment systems – terminals where payment cards are "swiped," "dipped," or "tapped" to collect payments.   In late 2011, plaintiff acquired Point International AB, northern Europe's largest provider of payment and gateway services and solutions for retailers, for €600 million.  Point International AB used the name "Point" in northern Europe for 25 years and had achieved high brand awareness.[2] Plaintiff adapted the European services model for the United States payment market seeking to leverage the goodwill and strength of Point International AB.  In May 2013, plaintiff introduced Point services, "a suite of services offered with [plaintiff's] payment terminals, establishing a secure commerce architecture" ("SCA"), using POINT. and VERIFONE POINT ("the Point marks").  The SCA allows merchants to continue using their existing cash register systems, while complying with EMV[3] chip technology, by using plaintiff's terminals and subscribing to Point services.  Plaintiff's terminals are named VX or MX and display the Point. logo on the screen if they are running Point services.  (D.I. 39)

4. Defendant makes a hardware device, "the Poynt Smart Terminal," which "is specifically designed for security and is certified as secure by the Payment Card Industry" ("PCI").  Defendant sells its terminal through merchant acquirers (large

---

[1] The parties have redacted certain financial and business information.  The court summarizes such information without detail, but has considered the entirety of the parties' submissions in the analysis below.
[2] Plaintiff provides the results of a 2010 brand survey in northern Europe showing high brand awareness for the name Point.  (D.I. 39, ex. D)
[3] Named after its original developers (Europay, MasterCard® and Visa®).  *See, e.g.*, https://www.chasepaymentech.com/faq_emv_chip_card_technology.html, last visited July 21, 2016.

2

banking institutions that process payments for merchants) for $499.  Defendant does
not provide payment services.  Osama Bedier ("Bedier"), defendant's CEO, chose the
name Poynt in the fall of 2013.  Bedier was aware in 2013 of Point International AB and
its 2011 acquisition by plaintiff, but he did not believe plaintiff would expand Point
services into the United States.  Bedier searched the United States Patent and
Trademark Office's ("PTO") trademark database multiple times (starting in October 2013
and as late as September 2014) to see whether plaintiff had registered the POINT mark
for use in the United States and found no such registration.  Defendant filed a trademark
application for "POYNT" on October 15, 2014.  (D.I. 49)  Plaintiff filed trademark
applications on December 31, 2014 for "POINT." and "VERIFONE POINT."[4]  (D.I. 38,
exs. A, B)

     5.  In late 2014, Bedier was a keynote speaker at the 2014 Money 20/20
tradeshow in Las Vegas, Nevada.  (D.I. 39 at ¶ 23)  Paul Galant ("Galant"), plaintiff's
CEO, stated that he made efforts to contact Bedier after the tradeshow "to catch up"
and discuss Bedier's use of the name Poynt.  He first spoke with Bedier in early 2015;
Bedier indicated that "he was open to the possibility of changing the branding of [Poynt
Co.] and its payment terminals to differentiate them from [plaintiff's] Point services."
(D.I. 41)  Bedier alleges that plaintiff reached out in January 2015 to discuss brand
names, but he does not recall any suggestion to change the Poynt name after January
2015.  (D.I. 49)  Plaintiff alleges that its executive vice president of commerce
enablement[5] met with Bedier in early 2015 to discuss a business resolution.  They had

---

[4] Receiving Registration Nos. 4,844,308 and 4,844,307 on November 3, 2015.
[5] Vincent D'Agostino ("D'Agostino").

several conversations in 2015, but the discussions did not involve trademark law, a lawsuit, or settlement.  (D.I. 40; D.I. 49)

6.  Plaintiff opposed defendant's trademark application on September 22, 2015. Bedier stated that he sought information from plaintiff regarding the trademark opposition to no avail.[6]  (D.I. 49)  On September 24, 2015, plaintiff's website described its payment services using the name "Point."  (D.I. 48, ex. B)  At the 2015 Money 20/20 tradeshow, the parties' booths were located directly across the aisle from each other. (D.I. 39 at ¶ 24)  Plaintiff reached out to Bedier in early 2016, but Bedier stated that he would not change the Poynt name and would contact Galant to further discuss the matter.  (D.I. 40)  As of March 5, 2016 (and as accessed by the court on August 2, 2016), plaintiff's website no longer featured the name Point.  (D.I. 48, ex. A)

7.  Defendant spent considerable funds on marketing and building its brand, and is currently poised to enter the market.  Bedier opines that the market for payment terminals is very hard to enter and no new market entrant has been able to acquire a significant percentage of card processing devices in the United States since plaintiff's founding in 1981.  Moreover, certification of devices is expensive and time consuming. (D.I. 49)

8.  Plaintiff's global net revenues were $2 billion in fiscal year 2015, of which 34.5% came from payment services.  In North America, payment services accounted for 31% of plaintiff's $791 million in revenue.  Plaintiff has a large budget for the marketing of its products and services in North America, of which a certain portion is dedicated to

---

[6] In November 2015, defendant refused plaintiff's request for an extension of time to submit initial disclosures related to plaintiff's opposition of defendant's trademark application.  (D.I. 38, ex. L)

4

marketing Point services.  Plaintiff continues to invest in marketing Point services

through attendance at tradeshows and smaller events.  Plaintiff sells its terminals and

Point services to merchants looking to replace their existing payment terminals with

EMV-compliant devices either directly or through merchant acquirers.  Larger

merchants tend to purchase directly from plaintiff.  As of January 31, 2016, a number of

payment terminals were under contract to run Point services, accounting for certain

revenue and monthly billing.  (D.I. 39)

9. **Standard.**  As explained by the United States Court of Appeals for the Third

Circuit,

> [p]reliminary injunctive relief is an "extraordinary remedy, which should be
> granted only in limited circumstances."  . . .  "A plaintiff seeking a
> preliminary injunction must establish that he is likely to succeed on the
> merits, that he is likely to suffer irreparable harm in the absence of
> preliminary relief, that the balance of equities tips in his favor, and that an
> injunction is in the public interest."  . . .  The "failure to establish any
> element . . . renders a preliminary injunction inappropriate."  . . .  The
> movant bears the burden of showing that these four factors weigh in favor
> of granting the injunction.

*Ferring Pharm., Inc. v. Watson Pharm., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) (citations

omitted).  "'[O]ne of the goals of the preliminary injunction analysis is to maintain the

status quo, defined as the last, peaceable, noncontested status of the parties.'"  *Kos*

*Pharm., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004) (citation omitted).  In a

trademark case, for example, "[it] is the situation prior to the time the junior user began

use of its contested mark."  *Id.* (citation omitted).  "[T]he decision whether to grant or

deny injunctive relief rests within the equitable discretion of the district courts, and . . .

such discretion must be exercised consistent with traditional principles of equity . . . ."

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 394 (2006).

5

10. **Likelihood of success on the merits – trademark infringement.** The

Lanham Act defines trademark infringement as use of a mark so similar to that of a prior

user as to be "likely to cause confusion, or to cause mistake, or to deceive." 15 U.S.C.

§ 1114(1). "Likelihood of confusion under the Lanham Act is not limited to confusion of

products[; c]onfusion as to source is also actionable." *Kos Pharms.*, 369 F.3d at 711.

To prove trademark infringement, plaintiff must show that: (1) the mark is valid and

legally protectable; (2) plaintiff owns the mark; and (3) defendant's use of the mark to

identify goods or services is likely to create confusion concerning the origin of the goods

or services. *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 472 (3d Cir.

1994) (citations omitted). The Third Circuit has identified a number of factors to aid in

determining likelihood of confusion. Those factors include:

> (1) the degree of similarity between the owner's mark and the alleged
> infringing mark; (2) the strength of the owner's mark; (3) the price of the
> goods and other factors indicative of the care and attention expected of
> consumers when making a purchase; (4) the length of time the defendant
> has used the mark without evidence of actual confusion arising; (5) the
> intent of the defendant in adopting the mark; (6) the evidence of actual
> confusion; (7) whether the goods, [even if] not competing, are marketed
> through the same channels of trade and advertised through the same
> media; (8) the extent to which the targets of the parties' sales efforts are
> the same; (9) the relationship of the goods in the minds of consumers
> because of the similarity of function; (10) other facts suggesting that the
> consuming public might expect the prior owner to manufacture a product
> in the defendant's market, or that he is unlikely to expand into that market.

*Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983) ("the *Lapp* factors").

"None of these factors is determinative in the likelihood of confusion analysis and each

factor must be weighed and balanced one against the other. . . . [T]he different factors

may properly be accorded different weights depending on the particular factual setting.

A district court should utilize the factors that seem appropriate to a given situation." *Kos*

6

*Pharms.*, 369 F.3d at 709 (citations and internal quotation marks omitted).  Where the marks are identical and/or used for competing goods, "the court need rarely look beyond the mark itself."  *Opticians Ass'n of Am. v. Indep. Opticians of Am.*, 920 F.2d 187, 195 (3d Cir. 1990).  "The Lapp factors are best understood as 'tools to guide a qualitative decision.'"  *Kos Pharms.*, 369 F .3d at 709 (citation omitted).

11. **Trademark rights.**  The four classifications of trademarks are:  arbitrary or fanciful, suggestive, descriptive, and generic.  Suggestive marks "require consumer 'imagination, thought, or perception' to determine what the product is, while descriptive marks "forthwith convey[ ] an immediate idea of the ingredients, qualities or characteristics of the goods."  *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 221-22 (3d Cir. 2000) (citations and internal quotation marks omitted).  "In order to qualify for Lanham Act protection, a mark must either be suggestive, arbitrary or fanciful, or must be descriptive with a demonstration of secondary meaning."  *Id.* at 222.

12. Survey evidence is routinely admitted in trademark cases to show "that a designation is viewed as a generic name rather than a mark," or to show "the existence of secondary meaning in a designation."  6 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 32:158 (4th ed.).  "The closer the survey methods mirror the situation in which the ordinary person would encounter the trademark, the greater the evidentiary weight of the survey results."  *Id.* at § 32:163.  In a survey, the "universe is that segment of the population whose perceptions and state of mind are relevant to the issues in the case."  "A survey of the wrong 'universe' will be of little probative value in litigation."  *Id.* at § 32:159.  Generally, "mere technical unreliability

goes to the weight accorded a survey, not its admissibility." *Citizens Fin. Grp., Inc. v. Citizens Nat. Bank of Evans City*, 383 F.3d 110, 121 (3d Cir. 2004) (citation omitted).

13.  Plaintiff asserts trademark rights based on its ownership of the federally registered Point marks.  (D.I. 37 at 6)  A trademark registered without a required showing of secondary meaning raises a rebuttable presumption that the mark is inherently distinctive.  2 *McCarthy* § 11:43 (citing cases).[7]  "The presumption may be rebutted by a showing that the mark is descriptive, not suggestive." *PaperCutter, Inc. v. Fay's Drug Co.*, 900 F.2d 558, 563 (2d Cir. 1990).

14.  Plaintiff argues that the Point marks are at the arbitrary or suggestive end of the spectrum, thus inherently distinctive.  (D.I. 37 at 9-10; D.I. 58 at 6)  Defendant responds that the marks are descriptive, as they provide information about the product and where the product is used, i.e., at the "point" of sale.[8, 9]  (D.I. 65 at 35)  As to secondary meaning, defendant commissioned a survey to determine whether "relevant customers regard the term 'point' as an identifier of source in the context of credit card

---

[7] The majority of Circuits hold this view.  The Third Circuit has not ruled on this issue. The Eleventh Circuit stated that it would "bestow proper respect to the determinations of the PTO, [but would] not defer to an ethereal determination that is not affirmatively stated by the administrative agency." *Investacorp, Inc. v. Arabian Inv. Banking Corp. (Investcorp) E.C.*, 931 F.2d 1519, 1524 (11th Cir. 1991).

[8] Defendant argues that the facts at bar are similar to those in *Bristol-Myers Squibb Co. v. McNeil-P.P.C., Inc.*, 973 F.2d 1033 (2d Cir. 1992), wherein the Court examined whether "PM" as affixed to an analgesic trade name (Excedrin PM and Tylenol PM) was descriptive or suggestive of the product.  The Court concluded that "PM" was a descriptive term not entitled to trademark protection without secondary meaning. *Id.* at 1040-41.  This argument applies at most to the "Verifone Point" mark, but does not aid the court in determining the classification of the "Point." mark.

[9] Defendant states in its brief that "similarities in a generic term are not cognizable for trademark purposes."  (D.I. 47 at 6)  Plaintiff interprets this singular phrase as an argument that "Point" as used in the marks should be classified as generic.  (D.I. 58 at 5-6)  The court declines to address this cursory argument.

8

processing machines or services." (D.I. 47 at 3; D.I. 51)  The survey, conducted by Hal

Poret ("Poret"), included a test group of 250 respondents who were asked about the

term "POINT."  The respondents were "merchants who accept credit cards at retail

stores/locations and who have responsibility for decisions about which credit card

processing machine or service their business uses to accept in-person credit card

payments." (D.I. 51 at 7)  Pertinent findings included that 16.8% of test group

respondents associated the term POINT with a particular company or companies that

provided credit card processing machines or services.  One respondent identified

plaintiff as the company, resulting in a 0.4% level of association of the term POINT with

plaintiff. (*Id.* at 25)  Poret concluded that "the term POINT does not identify any single

source in connection with credit card processing machines or services, and certainly

does not identify [plaintiff] as a single source." (*Id.* at 28)

15.  Plaintiff criticizes the survey as "using the wrong universe," arguing that it

was directed to defendant's market.  According to plaintiff, the survey was over-inclusive

because it did not exclude merchants unconcerned about EMV compliance.  The survey

was under-inclusive because it excluded large and mid-size merchants likely to use (or

be interested in) EMV-compatible systems, as well as intermediaries that sell plaintiff's

products to small merchants.  Plaintiff critiques the question language, arguing that it

should have been framed relevant to "payment software and services."  Poret also

improperly truncated the Point marks, using "POINT" instead of VERIFONE POINT or

POINT., or the colloquial term "Point services."  Plaintiff argues that secondary meaning

does not require identification of the source, rather recognition that a source exists.  As

17% of respondents identified "Point" as associated with a company (mostly identifying

9

"Point" with plaintiff's partners Chase, Vantiv, or First Data), plaintiff concludes that the survey establishes that the goods emanate from a single source.  (D.I. 58 at 2)

16.  The court declines to decide the classification of the Point marks (a factual issue) at the preliminary injunction stage.  Plaintiff chose to introduce Point services and the Point marks in the United States after its acquisition of Point International AB.  A "point of sale" is a term used in the United States and a consumer could associate Point services with a "point of sale."  Accepting plaintiff's "suggestive" designation requires that the court move forward with the likelihood of confusion analysis.  Accepting defendant's classification of the mark as "descriptive" requires that plaintiff's marks have secondary meaning.  While the European success of the name "Point" does not establish secondary meaning in the United States, the court will not infer a lack of secondary meaning solely from defendant's survey at this juncture.[10]  *Charles Jacquin Et Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 475 (3d Cir. 1990) ("[A] plaintiff's failure to conduct . . . a survey where it has the financial resources to do so, could lead a jury to infer that the plaintiff believes the results of the survey will be unfavorable."); 6 *McCarthy* § 32:190 (compiling cases determining what percentage of persons who use the designation to identify a source constitutes a "significant" amount.).  The court proceeds to the analysis of likelihood of confusion addressing each of the *Lapp* factors.

17.  **Degree of similarity (*Lapp* #1).**  To determine the similarity of the marks, the court looks to "the sight, sound, and meaning of the marks" to determine "whether

---

[10] In this regard, the parties dispute both the admissibility of the survey and the interpretation of the results.  Even crediting the criticisms of plaintiff, the survey is not so flawed as to be inadmissible.  *Cf. Citizens Fin. Grp.*, 383 F.3d at 121 (finding a survey inadmissible, wherein "the consumers surveyed in this case were located outside of [defendant]'s customer base.").

the [marks] create the same overall impression when viewed" as a consumer. *A & H Sportswear*, 237 F.3d at 216 (citation omitted).  Comparing "Verifone Point" and "Point." with "Poynt," there can be no real dispute that the marks are similar in sight and sound. As to meaning, plaintiff argues that "Poynt" is a variation on the spelling of "point," and should be given the same meaning.  Defendant states that "point" is a shortened version of "point of sale" and that "POYNT uses this fact to indicate that the Poynt Smart Terminal is an innovative" point of sale device.  Although plaintiff's Point. mark is displayed on the screen of its terminal and defendant's mark is displayed on the terminal, the overall impression of the marks is similar.  This factor weighs in favor of plaintiff.

18.  **Strength of mark (*Lapp* #2).**  Courts examine (1) the mark's distinctiveness or conceptual strength (the inherent features of the mark) and (2) its commercial strength (the factual evidence of marketplace recognition).  *A & H Sportswear*, 237 F.3d at 221.  The conceptual strength of a mark is measured by classifying the mark in one of four categories ranging from the strongest to the weakest:  arbitrary or fanciful; suggestive; descriptive; or generic.  Stronger marks receive greater protection.  *Id.* (citation omitted).  As discussed above, plaintiff asserts that the Point marks are on the arbitrary or suggestive end of the spectrum.  As to commercial strength, the awareness of the Point name in the European market does not indicate recognition in the market at bar.  On September 24, 2015, plaintiff's website described its services using the term "Point," but on March 5, 2016 (and indeed as accessed by the court on August 2, 2016), the website no longer features such term.  Based on this, plaintiff's advertising and

marketing evidence, along with defendant's survey results, the court concludes that the marks are not commercially strong.

19. "Reverse confusion occurs when a larger, more powerful company uses the trademark of a smaller, less powerful senior owner and thereby causes likely confusion as to the source of the senior user's goods or services." *Fisons*, 30 F.3d at 474. In other words, "the junior user's advertising and promotion so swamps the senior user's reputation in the market that customers are likely to be confused into thinking that the senior user's goods are those of the junior user . . . ." 4 *McCarthy* § 23:10. Plaintiff suggests that the present case has elements of "reverse confusion" as merchants less familiar with the payments industry may believe Point services are affiliated with Poynt. Therefore, plaintiff's commercial strength is less relevant. *Commerce Nat. Ins. Servs., Inc. v. Commerce Ins. Agency, Inc.*, 214 F.3d 432, 444 (3d Cir. 2000) ("[T]he lack of commercial strength of the smaller senior user's mark is to be given less weight in the analysis because it is the strength of the larger, junior user's mark which results in reverse confusion.") (citation omitted). Plaintiff's argument is not persuasive in the context at bar, as defendant is a new company and is not engaged in substantial promotion, so as to "swamp" plaintiff's reputation in the market. Moreover, plaintiff offers contrary statements. On the one hand, plaintiff asserts that the Point marks are "well recognized among at least some merchants and merchant acquirers" and have acquired secondary meaning, yet on the other, argues that plaintiff has been in the United States market for only three years and has not yet achieved substantial traction. (D.I. 37 at 10-11; D.I. 65 at 15) This factor is neutral.

20. **Consumer care in purchase (*Lapp* #3).** "Where the relevant products are expensive, or the buyer class consists of sophisticated or professional purchasers, courts have generally not found Lanham Act Violations," as the purchasers exercise more care in item selection. *Checkpoint*, 269 F.3d at 284-85. The parties both sell to merchant acquirers. The end customers are merchants replacing existing payment terminals with EMV-compliant devices. Plaintiff also sells directly to larger merchants. The cost of the parties' services and units is similar. The parties agree that merchant acquirers are sophisticated purchasers. Although plaintiff points out that small merchants may select a terminal fairly quickly (D.I. 58 at 7), the court concludes that such merchants who depend on sales for their livelihood would certainly exercise care in selecting a terminal and corresponding services. *See Freedom Card*, 432 F.3d 477-78 (finding no error in the district court's reliance upon the expert's testimony and conclusion that consumers exercise care in the selection of a credit card). Moreover, defendant sells a terminal, whereas plaintiff sells its Point services for use on plaintiff's terminal (which terminal does not bear the disputed marks unless running Point services). Most importantly, the common purchaser is the sophisticated merchant acquirer. The court concludes confusion is unlikely and this factor weighs in defendant's favor.

21. **Defendant's use of mark (*Lapp* #4) and evidence of actual confusion (*Lapp* #6).** Although "[e]vidence of actual confusion is not required to prove likelihood of confusion," such evidence strengthens plaintiff's case. *Checkpoint*, 269 F.3d at 291. "If a defendant's product has been sold for an appreciable period of time without evidence of actual confusion, one can infer that continued marketing will not lead to

consumer confusion in the future.  The longer the challenged product has been in use, the stronger this inference will be." *Versa Products Co. v. Bifold Co. (Mfg.)*, 50 F.3d 189, 205 (3d Cir. 1995).  The parties dispute when defendant's use of the mark began, with defendant advocating for October 2014, when it began use of the name POYNT publicly, and plaintiff advocating for a later date.  Plaintiff provides the following evidence of actual confusion.  Plaintiff's regional head of payments as a service for North America[11] states that, at tradeshows and during calls with actual and potential customers, he has been asked whether the "Poynt" terminal is related to plaintiff's services and to spell "Point" to differentiate it.  He also received an email from the vice president of Fishbowl, a company focused on restaurant marketing and analytics, following up on "a very brief conversation" at a tradeshow about a "possible relationship between Fishbowl and Verifone," referencing "the great work [plaintiff's] team has done with Poynt" ("the Fishbowl email").  (D.I. 42)  Plaintiff's vice president of sales enablement[12] testified that he has been asked at tradeshows (recalling one specific encounter) and in calls with potential customers whether "Poynt" is related to plaintiff and to spell "Point."  (D.I. 39 at ¶ 36; D.I. 38, ex. Q at 348-49, 351)   Another officer[13] testified that, in presentations with clients, he had to carefully distinguish "Point" from "Poynt."  (D.I. 38, ex. P at 48-49, 158-59)

22.  The above testimony does not demonstrate actual confusion.  At most, it indicates that certain customers inquired as to whether the companies were related.  The Fishbowl email is the result of a brief conversation, references plaintiff and, without

---

[11] James Surber.
[12] Jeffrey Wakefield.
[13] D'Agostino.

14

more context, is not persuasive evidence of actual confusion. *See, e.g., Denimafia Inc. v. New Balance Athletic Shoe, Inc.*, Civ. No. 12-4112 AJP, 2014 WL 814532, at *19 (S.D.N.Y. Mar. 3, 2014) (The court concluded that the proffered emails showed individuals contacting plaintiff to inquire whether the parties were working on a collaboration, but did not show that the use of the disputed mark "affected a purchasing decision of any kind or confused them as to the source of the products."). This factor is neutral.

23. **Defendant's intent (*Lapp* #5).** "[C]ourts have recognized that evidence of 'intentional, willful and admitted adoption of a mark closely similar to the existing marks' weighs strongly in favor of finding the likelihood of confusion." *Checkpoint*, 269 F.3d at 286. Plaintiff does not assert that defendant intentionally chose the Poynt mark to create confusion. There is no dispute that defendant knew that plaintiff had acquired Point International AB and of the Point name used in Europe. Defendant checked the PTO trademark database multiple times (as late as September 2014) before filing a trademark application in advance of plaintiff's application. In the context of reverse confusion, "the intent inquiry must also be altered to focus on whether the defendant was aware of the senior user's use of the mark in question, or whether the defendant conducted an adequate name search for other companies marketing similar goods or services under that mark." *Commerce*, 214 F.3d at 444 (citation omitted). Analyzing forward or reverse confusion, the timeline speaks volumes as to intent. This factor weighs in favor of defendant.

24. **Channels of trade and media (*Lapp* #7).** The greater the similarity between the parties' advertising and marketing campaigns, the greater the likelihood of

confusion. *Checkpoint*, 269 F.3d at 289; *Kos Pharms.*, 369 F.3d at 722. "This is a 'fact-intensive inquiry' that requires a court to examine the 'media the parties use in marketing their products as well as the manner in which the parties use their sales force to sell their products to consumers.'" *Kos Pharms.*, 369 F.3d at 722 (quoting *Checkpoint*, 269 F.3d at 289). The parties participate in the same tradeshows. Both parties sell to merchant acquirers, with defendant doing so exclusively. Unlike plaintiff, defendant does not provide payment services making confusion less likely. This factor is neutral.

25. **Intended customers (*Lapp* #8).** When the parties target their sales efforts to the same consumers, there is a stronger likelihood of confusion. *Checkpoint*, 269 F.3d at 289-90. Plaintiff points out the similarities in the "target merchants," small merchants needing to upgrade payment systems to comply with EMV regulations. However, the actual purchasers shared by the parties are sophisticated merchant acquirers, which decreases the likelihood of confusion. This factor is neutral.

26. **Relationship of goods and services (*Lapp* #9).** The test for determining the relationship of goods in the minds of consumers is whether the goods are similar enough that a consumer could assume they were associated with or offered by the same source. *Fisons*, 30 F.3d at 481; *Checkpoint*, 269 F.3d at 286-87. "Near-identity" and "similarity of function" are key to assessing whether consumers may see products as related. *A & H Sportswear*, 237 F.3d at 215. The closer the relationship between the products, the greater the likelihood of confusion. *Kos Pharms.*, 369 F.3d at 722. Plaintiff focuses on the fact that "Poynt is part of the same payment eco-system as Point services." However, from the point of view of the merchant acquirer (the common

consumer at bar), defendant offers a terminal, whereas plaintiff provides payment services and a terminal.  This factor is neutral.

27.  **Other factors (*Lapp* #10).**  Plaintiff argues that the potential for future confusion is great, while defendant counters that plaintiff is not actively expanding the scope of the Point brand.  This factor is neutral.

28. **Weighing of the *Lapp* factors.**  The marks at bar are similar.  However, plaintiff sells its terminal solely to sophisticated purchasers, merchant acquirers.  Balancing the *Lapp* factors presented above and considering the totality of the circumstances, plaintiff has failed to demonstrate that confusion is likely.

29.  **Likelihood of success on the merits – conclusion.**  For the reasons articulated above, plaintiff has not carried its burden to prove likelihood of success on the merits of its trademark infringement claim.

30.  **Irreparable harm.**  Plaintiff argues that the Point marks are still young in the United States and it is invested in developing them.  Plaintiff speculates that future confusion is inevitable as defendant's terminals are shipped to end customers.  Plaintiff concludes that calculating lost revenue due to such confusion will be impossible.  Defendant is about to launch its product and quantifies the monetary damages it would suffer due to delay, recertification, and rebranding.[14]  This factor weighs in favor of defendant.

31.  **Reputation and goodwill.**  Plaintiff argues that it has continuously used the Point marks since introducing such in the United States, and is actively using them

---

[14] Plaintiff disagrees with defendant's calculations, asserting that recertification is an easy and quick process.  At this juncture, defendant has quantified its damages, sufficient to show the logical effect of rebranding its product.

17

today.  According to plaintiff, allowing the Poynt terminals to enter the market will
frustrate plaintiff's efforts to "shape the reputation and goodwill" of its brand.  Plaintiff
speculates that any quality or security issues with defendant's terminals will cause it
damage.  Defendant responds that plaintiff is not actively using the Point marks (citing
to the lack of the Point name on plaintiff's webpage) and that its terminals have received
the highest certification for security offered by the industry's organization.  The common
purchaser of the parties' products are merchant acquirers and the court concluded
above that there was not a likelihood of confusion.  Plaintiff offers only speculative
damages.  This factor is neutral.

32. **Irreparable harm – conclusion.**  Based on the above analysis, the balance
of factors presented to the court weigh in favor of defendant.  Plaintiff has not
demonstrated irreparable harm.

33. **Balance of hardships.**  The parties dispute the tone and substance of the
2015 discussions, with plaintiff asserting that it was told for the first time in January
2016 that defendant would not change its name.  On September 22, 2015, plaintiff
opposed the trademark application, filed the instant action February 24, 2016, and
moved for a preliminary injunction on March 21, 2016.  The timeline balanced against
the disputed discussions does not favor either party.  Defendant searched the PTO
database and, finding nothing, applied for a trademark before plaintiff's applications
were filed.  Defendant has offered information to the court quantifying the damage it
would suffer from an injunction.  This factor weighs in favor of defendant.

34. **Public interest.**  This factor is largely neutral.  The public has an interest in
not being deceived or confused.  On the record at bar, no confusion has been

18

evidenced. The common purchasers of the parties' products are sophisticated decision makers, merchant acquirers.

35. **Conclusion.** For the foregoing reasons, plaintiff's motion for preliminary injunction (D.I. 7) is denied.

United States District Judge

19